(No. 5057-)

Mavis J. Welch, Administratrix of the Estate of Robert Reed Welch, Deceased, Claimant, *vs.* State of Illinois, Respondent.

*Opinion filed February 24, 1966.*

Brunsman and Giffin, Attorneys for Claimant.

William G. Clark, Attorney General; C. Arthur Nebel, Assistant Attorney General, for Respondent.

Perlin, C. J.

Claimant, Mavis J. Welch, Administratrix of the Estate of Robert R. Welch, seeks recovery of $25,000.00 in damages arising out of the death of Robert R. Welch on October 13, 1961.

On that date, Robert Welch was operating a truck, consisting of a tractor and a trailer, in a westerly direction on Route No. 144 about two miles west of Murphysboro, Jackson County, Illinois. Claimant alleges that respondent "negligently and carelessly" permitted Route No. 144 to become dangerous and hazardous to the public by allowing a hole, which was seven feet wide and three feet deep, to remain on the shoulder of the road. Claimant further alleges that, as a direct and proximate result of respondent's negligence, Robert Welch was caused to violently collide with the hole in the shoulder, and, as a proximate result of such collision, he died.

Route No. 144 consisted of two lanes, and, according to the Report of the Division of Highways, was built of cement, eighteen feet wide with a shoulder eight feet wide,

and a guard fence six feet from the edge of the pavement. The general location of the accident was about 100 feet east of the Indian Creek Bridge. The highway alignment is a straight line for more than 1,000 feet both east and west of the site of the accident.

Mr. Elvie Benefield testified that he and Mr. Welch had been employed by Gordon Transport Company for many years as drivers and that Benefield usually drove his truck behind the one operated by Welch. Benefield observed that on the morning of the accident Welch was in good health, and testified that the trucks had been inspected before the trip, and were found to be in good condition. Both Welch and Benefield made three round trips per week between Centralia, Illinois and Memphis, Tennessee.

Immediately prior to the accident, Benefield was driving a few minutes behind Welch. As they approached Murphysboro, there was a light sprinkle of rain, which stopped, but the pavement was wet. Welch was driving at about 45 miles per hour. As Benefield came over the hill located before the point of the accident, he saw two or three people standing in the middle of the highway. He than saw the Gordon Transport sign in the ravine on the right side of the road. The truck containing Welch was 35 to 40 feet down in the ravine. Benefield saw tire tracks on the road, which led into a hole in the shoulder. Benefield climbed into the hole, and estimated it was about four feet deep and three feet wide, and contained grass and leaves. The tracks showed that, after the truck hit the hole, it went into the guard rail, and from there into the ravine. Benefield was able to see the tracks leading from the pavement to the truck driven by Welch. He examined the tracks about 150 feet back, and none were over the center line.

According to Benefield, the tracks first left the road about 100 feet back from where they ran into the hole, and

gradually pulled off the road until they hit the hole, although the wheel on the left hand side did not go off the pavement until the truck turned over, which appeared to be at the point where it hit the hole.

On the opposite side of the road about 150 feet from the truck, there were tire marks of a car and a dented guard rail, which indicated that a car had hit the guard rail and bounced away. There was a gap where the vehicles left the road, which indicated that they did not come in contact with each other, nor did they pass each other.

Berdel Hasemeyer, the State Highway patrolman called to the scene of the accident on the day in question, confirmed Mr. Benefield's testimony. He saw the Gordon tractor-trailer in the embankment on the north side of the road, and determined that there had been no contact between the car, which was parked on the south shoulder, and the truck, which was driven by Welch. He saw tire marks from the truck on the wet pavement, but no skid marks. The tire marks were very clear. Going down the hill the tracks were never any closer than six inches from the center line. They were not on the wrong side. Towards the bottom of the hill, according to Trooper Hasemeyer, the tracks veered slightly towards the shoulder, then to the guard rails, and on into the hole and down to where it stopped. The hole in question was on the shoulder about two and one half feet from the edge of the concrete. It contained weeds and leaves and did not appear to have been a fresh hole. Hasemeyer said he measured the tracks where the truck began to leave the road about 122 feet from the hole. The measurements of the hole were seven feet, six inches wide and three feet deep. The shoulder was generally rough at a normal speed. The tire marks of the truck looked like the driver was attempting to pull back onto the pavement. The tracks indicated that the left drive wheel was on the edge of the

pavement, and the other track was on the shoulder. Trooper Hasemeyer explained that Welch's tracks were visible because he was braking, thus squeezing the moisture out of the tires, and there was no question but that the tracks were made by the Welch truck. In Trooper Hasemeyer's opinion, from an observation of the tracks, the truck lost its balance from striking the hole. Hasemeyer further testified that he knew the deceased, and, having observed his driving, thought he was one of the "very safest of drivers."

State Trooper William Maurizio testified that he accompanied Trooper Hasemeyer in investigating the accident. From his observation, the hole in question had been there quite a while. He also saw the line of tire tracks, and had no doubt but that they were made by the Welch truck. He stated: "We followed the line of tracks right down to the hole, and to the truck." The marks from the Welch truck led off gradually on the shoulder, and there was no sharp turn in the tracks at any point. The tracks were six to eight inches from the center line when they were on the pavement. According to Trooper Maurizio, the railing on the other side of the road had been hit and scraped to the west, or ahead of where the truck was going. There were no tire marks on that side of the road except at the damaged guard rail.

Dallas Hawk, section man for the area for the State of Illinois, testified that his duties consisted of fixing the road, including holes in the shoulder. He had been over the portion of Route No. 144 in question the morning of the accident looking for anything that might hinder traffic, but found nothing unusual. He had never seen the hole, but stated there was a possibility that the weeds, leaves and honeysuckle had filled up the hole, and that it was not easily distinguishable. The shoulder had not been mowed since August, according to Hawk.

Irving Lee Ferringer, the second man on the maintenance truck with Mr. Hawk, did not see the hole when he had driven by that morning.

The maintenance men testified that the road washes badly at that point, and the area had been flooded in May.

Charles Gillooley testified that he was a witness to the accident. He was driving east on Route No. 144 at about 8:30 or 9:00 A.M. He estimated his speed at about 50 miles per hour. It was drizzling. Another car passed him, as he was proceeding east. He subsequently learned that this car was driven by Frankie Edwards. He saw the Edwards car go into a skid. The driver temporarily lost control of his car, went over the shoulder on his side, and ran into the guard rail. Finally getting the car under control, he got back onto the highway. Edwards had already passed Gillooley when he went into the skid, according to Gillooley. Gillooley saw a Gordon Transport truck coming from the other direction shortly after the Edwards car skidded. He noticed the truck because the lights were flashing on it. The Edwards car was about 100 feet ahead of him at the time he saw the truck, and had come back onto the pavement. The truck and the car did not come together, but the truck hit the shoulder, and took off the fence. As far as he could see, the truck seemed to lose control, hit the shoulder, and appeared to go off suddenly. The witness was about 100 feet from the westbound truck when it left the road. He estimated that Edwards was going about 60 miles per hour when he went into a skid on the wet pavement, and thought the skid stopped at about the center line. Gillooley thought the truck driver could have seen the Edwards car as the truck came down the hill, since his headlights flashed.

Frankie Edwards testified he was driving east on Route No. 144, and had passed a car, "After I got past and back on my side of the road this truck was coming down the road

towards me. He blinked his headlights twice, and appeared to be over the black line." Edwards testified that he put on his brakes, pulled over to the shoulder, crashed into the guard rail, and then pulled back onto the pavement on his own side. He did not see the truck go off the road. He estimated his speed to have been 40 or 45 as he passed the Gillooley car. It was hazy, and had been raining, or had just stopped. The pavement was wet. Edwards stated that he did not start skidding until he was back on his side of the road, and then he applied his brakes, and skidded into the guard rail. The truck was blinking his headlights, and appeared to be riding on the center line.

Claimants may not recover unless they prove by a preponderance of the evidence that (1) Robert Welch was free from contributory negligence; (2) that respondent was negligent; and, (3) the negligence of respondent was the proximate cause of the accident.

Three witnesses, including the two State Troopers who were at the scene of the accident immediately after it occurred, testified that they could clearly see the tracks of Welch's truck going along the highway, and then gradually easing off onto the shoulder and right into the hole, and thence down to the point where the truck was located in the ravine. They explained the tracks were visible because of Welch's action in pumping his brake. They all testified that the tracks were never closer than six inches to the center line. Both Benefield and Trooper Hasemeyer testified that Welch was an extremely safe driver.

Witnesses Edwards and Gillooley both testified that the Edwards car passed the Gillooley car on a two lane highway coming towards Welch's truck. Edwards passed the Gillooley car, and then put on his brakes. He skidded onto the shoulder, and crashed into the guard rail before passing the Welch truck, which had by then gone off onto the

shoulder. It was a hazy day, and Gillooley thought that the truck went off suddenly. Edwards testified that it "appeared" to be over the center line. However, the clearly visible tracks showed that the truck was not over the center line, and had, in fact, gone off the road gradually.

It is not unreasonable for a driver to pull over to the shoulder of the road after seeing a car in his own lane coming towards him, which apparently is what happened when Welch saw the Edwards car pass the Gillooley car. This is indicated by the fact that Welch blinked his headlights in warning, as he came over the hill.

That the hole caused the truck to go into the ravine, killing Welch is shown by the fact that the tracks ran gradually into the hole, and then abruptly veered over the guard rail. The witnesses testified that the hole appeared to have been there a long time, as shown by the vegetation growing in it. The State's maintenance men testified that the last mowing had been in August, two months before the accident, and that the area washes badly from floods. Therefore, the State should have known of the defective condition of the shoulder by the exercise of reasonable care, which would encompass frequent mowing of the vegetation at a spot, which is likely to develop holes and defects. It would seem that the dangerous holes on the shoulders are not those, which can be readily seen from driving along the road, but are those which are hidden by vegetation.

"Highway" is defined as any public way for vehicular traffic, which has been laid out pursuant to State law (Ill. Rev. Stats., Chap. 121, Sec. 2-202), and includes "appurtenances necessary or convenient for vehicular traffic." Since a road shoulder is both necessary and convenient for vehicular traffic, it follows that reasonable care by the State of such shoulder is required.

In the instant case, the shoulder was being used for

an intended purpose—that of avoiding an apparent accident due to the Edwards car being on the wrong side of the highway in passing Gillooley and skidding out of control.

The law of the United States, in absence of specific state statutory provisions, requires travelers in vehicles each to turn to the right, if reasonably practical, when they meet each other upon a highway. (25 *Am. Jur.* 2d, Highways, Sec. 206.)

Therefore, there was no contributory negligence on the part of Robert Welch in gradually pulling off to the right, and leaving the pavement in order to pull onto the shoulder. There was negligence on the part of the State in not maintaining the shoulder in a safe condition for the use to which it was devoted.

We do not by this opinion purpose to expand the degree of responsibility imposed upon the State in the maintenance of a shoulder. This Court has long held that respondent is not bound to maintain a shoulder in the same condition as the paved surface of the highway. (*Sommer, Et Al,* vs. *State of Illinois,* 21 C.C.R. 259; *Howell* vs. *State of Illinois,* 23 C.C.R. 141; *Lee* vs. *State of Illinois,* No. 5076.)

For example, a shoulder, which is a few inches lower than the pavement, does not amount to negligence *per se.* This Court further held in the above cited cases that the State has no duty to maintain the shoulder in such a manner as would insure the safety of vehicles, which turn onto the shoulder, and then attempt to return to the pavement without slackening speed.

Mr. Welch's death left his widow and five minor children without support. His income for 1960 was $9,071.89, and for 1961 was $7,149.98. His life expectancy was 23.1 years.

Therefore, claimant is awarded the sum of $25,000.00.